UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

TRACIE DANETTE PEREZ,

    Plaintiff,

    v.

ANDREW SAUL,[1] Commissioner of Social Security,

    Defendant.

No. 1:18-cv-01036-GSA

**ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF COMMISSIONER OF SOCIAL SECURITY AND AGAINST PLAINTIFF**

## I.    <u>Introduction</u>

Plaintiff Tracie Danette Perez ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying in part and granting in part her application for disability insurance benefits pursuant to Title II and supplemental security income pursuant to Title XVI of the Social Security Act. The matter is currently before the Court on the parties' briefs which were submitted without oral argument to the Honorable Gary S. Austin, United States Magistrate Judge.[2] *See* Docs. 17, 18 and 19. Having reviewed the record as a whole, the Court finds that the ALJ's decision is supported by substantial evidence and applicable law. Accordingly, Plaintiff's appeal is denied.

---

[1] Commissioner of Social Security Andrew Saul is substituted as Defendant pursuant to Fed. R. Civ. P. 25(d). *See also* Section 205(g) of the Social Security Act, 42 USC 405(g) (action survives regardless of any change in the person occupying the office of Commissioner of Social Security).
[2] The parties consented to the jurisdiction of the United States Magistrate Judge. *See* Docs. 8 and 10.

1

## II. Procedural Background

On January 6, 2014, Plaintiff filed an application for disability insurance benefits alleging disability beginning March 31, 2011.  AR 67.  The Commissioner denied the application initially on August 21, 2014, and upon reconsideration on December 23, 2014.  AR 7.  On February 2, 2015, Plaintiff filed a request for a hearing before an Administrative Law Judge.  AR 67.

Administrative Law Judge Nancy M. Stewart presided over an administrative hearing on October 13, 2016.  AR 90-103.  Plaintiff appeared without an attorney.  AR 92.  Following a brief colloquy concerning Plaintiff's right to an attorney and questioning to ensure that the agency secured all of Plaintiff's medical records, the ALJ adjourned the matter to allow Plaintiff to retain counsel.

On November 17, 2016, Plaintiff filed an application for supplemental security income again alleging disability beginning March 31, 2011.  AR 67.

Administrative Law Judge Stewart presided over a second administrative hearing on January 3, 2017.  AR 104-34.  Plaintiff appeared and was represented by an attorney.  AR 104.  Impartial vocational expert Judith Najarian testified.  AR 104.

On March 29, 2017, the ALJ granted Plaintiff's application but determined that the onset date of disability was May 9, 2016.  AR 67-81.  As a result, Plaintiff was entitled to supplemental security income beginning May 9, 2016, but was not entitled to disability insurance benefits since she was not disabled before her last insured date of March 31, 2014.  AR 81.

The Appeals Council denied review on June 22, 2018.  AR 1-4.  On August 1, 2018, Plaintiff filed a complaint in this Court.  Doc. 1.

## III. Factual Background

### A. Plaintiff's Testimony

#### 1. Agency Hearing

Plaintiff (born May 10, 1966) completed high school.  AR 107.  She managed a dry-cleaning shop for about eight years beginning in about 2000.[3]  AR 114.  In that job, Plaintiff trained and supervised employees as well as performing various tasks such as inventory, spotting,

---

[3] Plaintiff was laid off when her employer went out of business in August 2008.  AR 437.

pressing, cleaning, cashiering, tagging and bagging clothing. AR 114-15. She spent most of the day on her feet and lifted items up to 50 or 60 pounds. AR 115.

In about 2009, Plaintiff's cervical spine was fused. AR 116. She still experienced sensory loss and numbness in both arms. AR 116-17. She unsuccessfully attempted to return to work in another dry-cleaning shop for three months in 2010. AR 113.

Plaintiff had a long history of right knee impairment, beginning with knee surgery following a motor vehicle accident in 1988. AR 108. Shortly thereafter, Plaintiff underwent two further surgeries: first, to remove hardware that had been inserted to stabilize the injured knee and second, to clear cartilage from the knee joint. AR 108-09. In September 2016, Plaintiff required surgery to replace her kneecap. AR 109.

Although Plaintiff used a walker or a cane, she continued to fall about twice a month because she did not lift her feet while walking. AR 109, 119. She could walk about 15 or 20 minutes before she needed to rest for a half an hour. AR 119-20. Plaintiff could sit about 20 to 30 minutes, but needed to move in her seat during that time period to relieve discomfort. AR 121.

Plaintiff experienced migraine headaches and vision problems. AR 118. She had a loss of feeling in her feet and elevated her feet twice daily. AR 121-22.

Imaging studies indicated that Plaintiff was experiencing spinal degeneration. AR 120. Although her doctors recommended surgery Plaintiff was reluctant to undergo the procedure, which had poor results for her husband. AR 120.

## 2. **Pain Questionnaire**

In a pain questionnaire dated July 26, 2013, Plaintiff reported chronic back and leg pain. AR 341. She was able to stand for five to ten minutes, sit for one hour and walk about one-half block. AR 344. If she lay flat, Plaintiff had no pain for two to three hours. AR 344. Her medications included Norco,[4] Gabapentin[5] and Mirapex.[6] AR 341.

---

[4] Norco (hydrocodone and acetaminophen) is a narcotic pain reliever prescribed for moderate-to-severe pain. www.medlineplus.gov/druginfo/meds/a601006.html (accessed November 13, 2019).
[5] Gabapentin is prescribed to relieve the pain of postherpetic neuralgia (shingles) and restless legs syndrome. www.medlineplus.gov/druginfo/meds/a694007.html (accessed November 13, 2019).
[6] Mirapex (Pramipexole) is a dopamine agonist prescribed to treat Parkinson's disease and restless legs syndrome. www.medlineplus.gov/druginfo/meds/a697029.html (accessed November 13, 2019).

### 3. **Adult Function Report**

Plaintiff reported that she was unable to walk because her legs felt like "Jell-O" and she had no feeling in them. AR 385. She fell frequently. AR 385. When she sat too long, Plaintiff experienced back and hip pain. AR 385. Plaintiff was afraid of hurting herself in a fall. AR 388. Her impairments affected lifting, bending, standing, walking, sitting, kneeling, remembering, climbing stairs, completing tasks and concentrating. AR 390.

Plaintiff tried to care for her daughters and grandchildren but sometimes was unable to do so.[7] AR 386. She had difficulty getting her legs over the side of the bathtub and needed assistance to put on her pants and shoes. AR 386. Her husband handled the shopping, and her teen-aged daughter helped with cooking. AR 387, 388. Plaintiff could help prepare some foods, and folded laundry while sitting. AR 387. She tried to clean house, taking breaks as needed. AR 387.

### 4. **Third-Party Adult Function Report**

Plaintiff's sister-in-law Cathy Vale reported that Plaintiff lacked strength in her extremities, tired easily and had no energy. AR 398. Plaintiff sometimes needed help dressing and bathing. AR 399. She had memory problems. AR 400. Plaintiff fell frequently and had difficulty getting up. AR 398. Plaintiff could cook things that were quick and easy to prepare. AR 400. She experienced pain while housecleaning. AR 400. Plaintiff's illness affected lifting, squatting, bending, standing, reaching, walking, kneeling, climbing stairs, memory, completing tasks, concentrating, understanding, following instructions and sometimes using her hands. AR 403. Ms. Vale strongly emphasized Plaintiff's inability to handle stress. AR 404.

### B. **Medical Records**

In May 2010, magnetic resonance imaging of Plaintiff's head revealed improving sinusitis and a single focus of ischemia or demyelination in the left parietal lobe of Plaintiff's brain. AR 688. Magnetic resonance imaging of Plaintiff's lumbar spine revealed mild degenerative disk

///

---

[7] Plaintiff had adult children from her first marriage and minor children from her current marriage.

disease and a 5 mm. posterior disk protrusion at L4-5 with mild impingement of the right L5 root at the right lateral recess. AR 690.

In August 2010, neurosurgeon Henry F. Aryan, M.D., conducted a consultation examination of Plaintiff at Dr. Nagavalli's request. AR 488-90. Plaintiff had experienced back problems "for some years," receiving conservative care including physical therapy and an epidural steroid injection. AR 488. Her back problems were now becoming progressively worse, and her leg problems were severe. AR 488.

Dr. Aryan's examination revealed diminished sensation in the L5 distribution on Plaintiff's right side. AR 489. She exhibited 4/5 weakness on right dorsiflexion and plantar flexion, but 5/5 strength on left dorsiflexion and plantar flexion and 5/5 strength for iliopsoas, quadriceps and hamstrings. AR 489. Dr. Aryan observed no atrophy, swelling, tenderness or lymphadenopathy. AR 489. The doctor diagnosed degenerative disc disease, worse at L4-L5. AR 489. There was slight spondylolisthesis of L5 on S1, facet arthropathy at L4-L5 and L5-S1, and foraminal stenosis, worse at L4-L5 on the right. AR 489. Dr. Aryan recommended spinal fusion at L4-S1. AR 490.

When Plaintiff saw Jacqueline De Castro, M.D., for medication refills in December 2010, Plaintiff was having second thoughts about back surgery. AR 664. Dr. De Castro found Plaintiff to be in a good mood and doing well. AR 664. In February 2012, Plaintiff returned to Dr. De Castro for continuing treatment of her chronic back pain, peripheral neuropathy and anemia. AR 681.

At the Family Healthcare Clinic in January 2012, Marcus Darius, PA-C, treated Plaintiff for severe (9/10) back pain and sciatica, prescribing Toradol[8] and Phenergan.[9] AR 718-20. Mr. Darius noted that Plaintiff needed to see Paramvir Sidhu, M.D., for a Norco evaluation. AR 720. Plaintiff saw Dr. Sidhu two days later and explained that she had been seeing Dr. Nagavalli, who had prescribed Norco. AR 715. Because of difficulty getting appointments with Dr. Nagavalli,

---

[8] Toraloc (Keterolac injection) is used to relieve moderately severe pain in adults. www.medlineplus.gov/druginfo/meds/a614011.html (accessed November 19, 2019).
[9] Phenergan (Promethazine) is used to relax and sedate patients. www.medlineplus.gov/druginfo/meds/a682284.html (accessed November 19, 2019).

Plaintiff had gone to the Family Healthcare Clinic after moving heavy furniture which injured her back. AR 715. Dr. Sidhu prescribed Vicodin[10] and told Plaintiff that he would not continue treatment until he had received and reviewed records of Plaintiff's treatment by Dr. Nagavalli. AR 717.

In June 2012, Plaintiff saw Dr. De Castro for treatment of anxiety and depression. AR 662. Plaintiff was feeling overwhelmed after she was assaulted by her mentally ill teen-aged daughter. AR 662. Following a discussion with Plaintiff concerning possible drug interactions and side effects, Dr. De Castro prescribed Alprazolam.[11] AR 662-63.

Magnetic resonance imagery of Plaintiff's lumbar spine in July 2012 showed mild degenerative disk disease. AR 692. The posterior disk protrusion at L4-L5 had "increased" to 3 mm. but no impingement of the nerve roots was observed. AR 692.

On January 8, 2013, Ken Zelsdorf, F.N.P., treated Plaintiff for lumbar strain in the urgent care clinic of Adventist Health. AR 641. Plaintiff had injured her back three days earlier while lifting, turning and bending, and was now experiencing moderate pain. AR 641. Mr. Zelsdorf prescribed Norco and Soma.[12] AR 642.

On January 11, 2013, Plaintiff saw Dr. De Castro for a follow up appointment to address her lumbar strain. AR 677. Plaintiff reminded the doctor that Dr. Aryan had recommended back surgery about four years earlier. AR 677. Plaintiff had deferred surgery, and subsequent prescriptions of Norco and a muscle relaxer had helped her. AR 677. Plaintiff told Dr. De Castro that she had made an appointment to see Dr. Aryan in about ten days. AR 677. The doctor observed tenderness and tightness of the left paravertebral muscles at the lumbosacral level. AR 677. Plaintiff was limping and favoring her right side. AR 677. After discussing with Plaintiff the difference between her previous back condition and muscle strain, Dr. De Castro prescribed

---

[10] Vicodin (Hydrocodone and Acetaminophen) is an opioid medication used to treat pain and inflammation. *See* www.medlineplus.gov/druginfo/meds/a002670.html (accessed November 19, 2019).

[11] Alprazolam is a benzodiazepine prescribed to treat anxiety and panic disorders. www.medlineplus.gov/druginfo/meds/a684001.html (accessed November 13, 2019).

[12] Soma (Carisprodol) is a muscle relaxant used with rest, physical therapy and other measures to relax muscles and relieve pain and discomfort caused by sprains, strains and other muscle injuries. www.medlineplus.gov/druginfo/meds/a682578.html (accessed November 19, 2019).

Norco and Valium.[13]  AR 677-78.  The doctor recommended warm and cold packs, moist heat, home back strengthening exercises and weight loss.  AR 677.

On January 18, 2013, the Emergency Department of Adventist Medical Center-Hanford treated Plaintiff for severe flank and back pain.  AR 613.  Examination and imaging identified no acute illness or lumbar spine injury.  AR 619, 621, 623.

Plaintiff returned to see Dr. De Castro on January 25, 2013 and complained of back pain so severe that she had gone to the emergency room.  AR 679.  Plaintiff had been taking four doses of Norco daily and needed another prescription.  AR 679.  Flexeril had not helped at all so Plaintiff requested Soma, which had been effective in the past.  AR 679.  Because Valium was making Plaintiff very sleepy, Dr. De Castro substituted a prescription for Alprazolam.  AR 679.  Dr. De Castro observed that Plaintiff was still limping and the paravertebral muscles in Plaintiff's lumbosacral area remained tender and tight.  AR 679.

On March 28, 2013, Plaintiff's daughter attempted suicide.  AR 685.  Because Plaintiff had to reschedule her appointment with Dr. Aryan, she saw Dr. De Castro on April 11, 2013, complaining of stress and seeking refills of Alprazolam and Soma.  AR 685.  Dr. De Castro added a prescription for Viibryd.[14]  AR 685-86.

In April 2013, magnetic resonance imagery of Plaintiff's head showed mild bilateral sinusitis.  AR 695.  A small cystic lesion in the anterior portion of the right temporal lobe was unchanged since April 2009.  AR 695.  In addition, the radiologist observed an interval increase of foci with increased FLAIR signal, which possibly indicated small vessel ischemic disease or migraine headaches.  AR 695.

X-rays of Plaintiff's left hip in August 2013 were normal except for some narrowing of the joint space, a nonspecific indication of mild arthritic changes.  AR 697.  Magnetic resonance imaging of Plaintiff's lumbar spine revealed hyperlordosis; mild degenerative disk disease; a posterior disk bulge and left posterolateral fissure of the annulus fibrosus at L1-L2; a mild

---

[13] Valium (diazepam) is a benzodiazepine prescribed to relieve anxiety and to control muscle spasms and spasticity.
www.medlineplus.gov/druginfo/meds/a682047.html (accessed November 13, 2019).
[14] Viibryd (Vilazodone) is prescribed to treat depression.   www.medlineplus.gov/druginfo/meds/a611020.html (accessed November 14, 2019).

posterior disc bulge and posterior central fissure of the annulus fibrosus at L2-L3; and, a 3 mm.

disk protrusion and fissure of annulus fibrosus at L4-L5.  AR 698-99.

In September 2013, Plaintiff was treated for severe knee pain and a puncture wound at the Emergency Department of Adventist Medical Center-Hanford.  AR 605.  X-rays revealed a 2 cm. metallic wire lodged in soft tissues adjacent to Plaintiff's knee cap.  AR 608.

Also in September 2013, Plaintiff saw Katelyn Schuck, PA-C, in the Family Health Clinic, seeking help for anxiety.  AR 712-13.  Plaintiff, who appeared anxious and teary, explained that she had separated from her husband because of disagreements arising from differences in parenting their bipolar daughter.  AR 712.  Ms. Schuck prescribed Hydroxyzine[15] and Paroxetine,[16] and referred Plaintiff to the Behavioral Health department.  AR 713.

In February 2014, Plaintiff saw Bassam I. Alzagatiti, M.D., for a neurological evaluation. AR 1205-07. Thereafter, Plaintiff would have a follow-up appointment with Dr. Alzagatiti approximately every two months.  AR1131-1208.  Notable developments are addressed below.

In February 2014, Charleen S. Bright conducted an initial psychological intake interview in the Behavioral Health Department of Family Health.  AR 828-33.  Plaintiff was experiencing depression, anxiety and panic attacks, in response to parenting her fifteen-year-old bipolar daughter.  AR 828.  Plaintiff was living with her parents-in law after separating from her husband who could not cope with their daughter's behavior.  AR 828, 830.  Ms. Bright diagnosed Plaintiff with adjustment disorder with mixed anxiety and depression, and opined that Plaintiff's GAF was 68.[17]  AR 830-31.  Ms. Bright recommended that Plaintiff participate in two psychotherapy sessions monthly and receive a psychiatry evaluation.  AR 831.  Julianna L. Yates, PA-C, agreed

---

[15] Hydroxyzine is an antihistamine prescribed to relieve anxiety and tension. www.medlineplus.gov/druginfo/meds/a682866.html (accessed November 19, 2019).

[16] Paroxetine is prescribed to treat depression and anxiety.  www.medlineplus.gov/druginfo/meds/a698032.html (accessed November 19, 2019).

[17] The Global Assessment of Functioning (GAF) scale is a rating from 0 to 100 and considers psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness. *Diagnostic and Statistical Manual of Mental Disorders*, 32-35 (4th ed. American Psychiatric Association 1994). A GAF of 61-70 corresponds to some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational or school functioning (e.g., occasional truancy or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships. *Id*.

with Ms. Bright and prescribed Klonopin[18] and Citalopram.[19]  AR 834-35.

In March 2014, Plaintiff saw Dr. Alzagatiti after completion of testing.  AR 782-787.  The increased dose of Gabapentin had improved the pain and numbness in Plaintiff's lower extremities and feet.  AR 782.  The Baclofen[20] prescription had reduced muscle spasm in Plaintiff's lower extremities.  AR 782.  Muscle strength, tone and bulk were normal except for mild weakness (4/5) of the right and left tibialis anterior muscles.  AR 785.  The doctor noted sensory loss to light touch, pinprick, temperature and sensation in areas of Plaintiff's lower extremities, but not in her upper extremities. AR 785.  Plaintiff walked slowly without major ataxia and had difficulty with tandem walking and heel and toe walking.  AR 785-86.  EMG and nerve conduction were normal.  AR 786, 1003-06.  Testing indicated deficiencies of vitamins B1, B12 and D.[21]  AR 786.  Because of a family history of neurological diseases and hyperreflexia of Plaintiff's lower extremities, Dr. Alzagatiti ordered a brain MRI to rule out demyelinating disease.  AR 786.

Plaintiff had not yet had a brain MRI when she again saw Dr. Alzagatiti in June 2014.  She complained of leg pain and stiffness, but no deterioration of her back pain.  AR 779.  The doctor noted no changes in his examination.  AR 779-81.  Performed in July 2014, the brain MRI was generally normal except for a "[s]olitary nonspecific 5 mm focus of abnormal signal intensity within the extreme capsule left brainstem, query small micro lacuna."  AR 791.  In August 2014, Plaintiff reported increased difficulty in walking, especially when climbing stairs.  AR 1191.  In October 2014, Dr. Alzagatiti ordered a spinal tap to further investigate the abnormal brain MRI.  AR 1008-15.

Thoracic spine x-rays in November 2014 revealed mild senescent changes with no myelomalacia or central canal stenosis.  AR 980.  Cervical spine x-rays showed post-surgical

---

[18] Klonopin (Clonazepam) is used to relieve panic attacks.  www.medlineplus.gov/druginfo/meds/a682279.html (accessed November 19, 2019).

[19] Citalopram is an antidepressant.  www.medlineplus.gov/druginfo/meds/a699001.html (accessed November 19, 2019).

[20] Baclofen acts on spinal cord nerves to reduce muscle spasms caused by multiple sclerosis or other spinal cord diseases.  www.medlineplus.gov/druginfo/meds/a682530.html (accessed November 19, 2019).

[21] The record also indicates recurring diagnoses of iron deficiency anemia following Plaintiff's 2005 gastric bypass surgery.  *See* AR 475-76.

changes since Plaintiff's prior spinal fusion, specifically, central canal stenosis most pronounced at C4-C5 and C6-C7 with mild to moderate neural foraminal narrowing. AR 981.

In January 2015, Plaintiff complained of developing intermittent left leg jerking when at rest or asleep. AR 1175. Dr. Alzagatiti diagnosed restless legs syndrome and prescribed a Neupro patch.[22] AR 1176.

In March 2015, orthopedist Frank L. Feng, D.O., examined Plaintiff concerning left arm numbness and tingling which extended to the left index and long finger. AR 976-77. Magnetic resonance imaging indicated mild disc protrusion at C4-C5 and C6-C7 without myelomalacia, but stenosis was not sufficiently severe to account for the numbness and tingling in Plaintiff's left hand. AR 977. Plaintiff had a full range of motion without pain and no motor deficits. AR 977. Phalen's test was positive in both wrists. AR 977. Dr. Feng recommended a nerve conduction study to rule out carpal tunnel syndrome. AR 977.

In February 2016, x-rays revealed degenerative changes in Plaintiff's right knee as well as the presence of a foreign object. AR 874. In September 2016, surgeon Christopher A. Verioti, D.O., performed a right knee patellofemoral joint arthroplasty (knee replacement). AR 895. X-rays on September 1, 2016 confirmed that the patellofemoral prosthesis was properly aligned. AR 922. Thereafter, Plaintiff participated in physical therapy. AR 938-51, 964-65, 1018-35, 1062-81, 1101-02.

In March 2016, Dr. Feng examined Plaintiff, who was experiencing recurrent pain, numbness and tingling in her right hip. AR 975. The doctor diagnosed mild osteoarthritis and trochanteric bursitis and administered a trochanteric bursal injection of depo-medrol, lidocaine and marcaine. AR 975.

In treatment notes dated November 17, 2016, Dr. Alzagatiti listed Plaintiff's diagnoses: restless legs syndrome; low back pain; contracture of muscles (multiple sites; spinal stenosis, cervical region; other disorders of sulfur-bearing amino-acid metabolism, including hyperhomocystinemia; white matter disease, unspecified; parathesia of skin; abnormal reflex

---

[22] Neupro (Rotigotine Transdermal Patch) is a dopamine agonist used to control involuntary movement in diseases including restless legs syndrome. www.medlineplus.gov/druginfo/meds/a607059.html (accessed November 18, 2016).

1  (hyperreflexia in lower extremities); vitamin D deficiency; and family history of neurological

2  diseases.[23]  AR 1132-34.

3       **IV.     Standard of Review**

4       Pursuant to 42 U.S.C. §405(g), this court has the authority to review a decision by the

5  Commissioner denying a claimant disability benefits.  "This court may set aside the

6  Commissioner's denial of disability insurance benefits when the ALJ's findings are based on

7  legal error or are not supported by substantial evidence in the record as a whole."  *Tackett v.*

8  *Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted).  Substantial evidence is evidence

9  within the record that could lead a reasonable mind to accept a conclusion regarding disability

10  status.  *See Richardson v. Perales*, 402 U.S. 389, 401 (1971).  It is more than a scintilla, but less

11  than a preponderance.  *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996) (internal citation

12  omitted).  When performing this analysis, the court must "consider the entire record as a whole

13  and may not affirm simply by isolating a specific quantum of supporting evidence."  *Robbins v.*

14  *Social Security Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citations and internal quotation marks

15  omitted).

16       If the evidence reasonably could support two conclusions, the court "may not substitute its

17  judgment for that of the Commissioner" and must affirm the decision.  *Jamerson v. Chater*, 112

18  F.3d 1064, 1066 (9th Cir. 1997) (citation omitted).  "[T]he court will not reverse an ALJ's

19  decision for harmless error, which exists when it is clear from the record that the ALJ's error was

20  inconsequential to the ultimate nondisability determination."  *Tommasetti v. Astrue*, 533 F.3d

21  1035, 1038 (9th Cir. 2008) (citations and internal quotation marks omitted).

22       **V.     The Disability Standard**

23          To qualify for benefits under the Social Security Act, a plaintiff must
            establish that he or she is unable to engage in substantial gainful
24          activity due to a medically determinable physical or mental
            impairment that has lasted or can be expected to last for a continuous
25          period of not less than twelve months.  42 U.S.C. § 1382c(a)(3)(A).
            An individual shall be considered to have a disability only if . . . his
26          physical or mental impairment or impairments are of such severity
            that he is not only unable to do his previous work, but cannot,

27

28  ---
[23] Plaintiff's father had multiple sclerosis; her mother had hereditary spastic paraplegia.  AR 1133.  Dr. Alzagatiti
noted that he could order hereditary spastic paraplegia genetic testing at Plaintiff's request.  AR 1134.

considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §1382c(a)(3)(B).

To achieve uniformity in the decision-making process, the Commissioner has established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 416.920(a)-(f). The ALJ proceeds through the steps and stops upon reaching a dispositive finding that the claimant is or is not disabled. 20 C.F.R. §§ 416.927, 416.929.

Specifically, the ALJ is required to determine: (1) whether a claimant engaged in substantial gainful activity during the period of alleged disability, (2) whether the claimant had medically determinable "severe impairments," (3) whether these impairments meet or are medically equivalent to one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1, (4) whether the claimant retained the residual functional capacity ("RFC") to perform his past relevant work, and (5) whether the claimant had the ability to perform other jobs existing in significant numbers at the national and regional level. 20 C.F.R. § 416.920(a)-(f).

## VI.     Summary of the ALJ's Decision

Administrative Law Judge Stewart found that Plaintiff had not engaged in substantial gainful activity from the alleged onset date of March 31, 2011. AR 69. Her severe impairments were asthma; eczema; disorder of the cervical spine, status post-surgery; disorder of the lumbar spine with radiculitis; restless leg syndrome; contracture of muscle at multiple sites; disorder of the shoulder, status post-rotator cuff repair; bilateral hip osteoarthritis and right greater trochanteric bursitis; polyneuropathy; right knee osteoarthritis; anxiety disorder; and, mood disorder. AR 69. None of the severe impairments met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 426.920(d), 416.925, 416.926). AR 70.

The ALJ concluded that Plaintiff had the residual functional capacity to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(c) and 416.967(c), including lifting and carrying 20

pounds occasionally and ten pounds frequently;[24] standing and walking for four hours and sitting for six hours in an eight-hour workday with the ability to stand and stretch at least 1-2 minutes at the end of each hour.  AR 70.  Plaintiff required the ability to rest 15 minutes every two hours, falling within normal breaks and lunch break.  AR 70.  Plaintiff could never climb ladders, ropes or scaffolds; kneel, crawl or crouch; or perform repetitive handling, fingering or feeling.  AR 70-71.  She could occasionally balance and stoop.  AR 71.  She required a cane for prolonged walking greater than 15 minutes at a time or on uneven terrain.  AR 70.  Plaintiff could perform non-complex, routine tasks.  AR 71.

Plaintiff had not been able to perform any past relevant work since March 31, 2011.  AR 79.  She was unable to transfer job skills.  On May 9, 2016, Plaintiff's age category changed from a younger individual aged 45-49 to a person closely approaching advance age.  AR 79.  Under the Medical-Vocational Rules, Plaintiff was not disabled prior to May 9, 2016 whether or not she had transferable job skills.  AR 80.  In addition, there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed.  AR 80.  Beginning on May 9, 2016, the Medical-Vocational Rules provided that an individual closely approaching advanced age without transferable skills was disabled.  AR 81.  There were then no jobs available in significant numbers in the national economy that Plaintiff could perform.  AR 81.   Accordingly, the ALJ found that Plaintiff was not disabled before May 9, 2016 but became disabled on May 9, 2016 when her age category changed.  AR 81.

## VII.   Analysis of Expert Medical Opinion

Plaintiff contends that the ALJ erred in disregarding portions of the medical opinions favorable to Plaintiff's claim and by failing to defer to Dr. Alzagatiti, a treating physician.  The Commissioner responds that the ALJ properly summarized the pertinent findings of each of the physicians, set forth the weight she attributed to each medical opinion, and explained why she concluded the weight of the evidentiary record best comported with her finding of Plaintiff's residual functional capacity.  The Court agrees with the Commissioner.

---

[24] The headnote to section five of the hearing decision includes two clerical errors.  First, the description of sedentary work is defined in 20 C.F.R. §§ 404.1567(*a*) and 416.967(a).  Second, sedentary work involves lifting no more than ten pounds.

### A.      Medical Opinions

#### 1.      Agency Physicians

In an initial review of Plaintiff's medical records dated August 12, 2014,[25] I. Ocrant, M.D., opined that Plaintiff's allegations and portrayal of her impairments were exaggerated.  AR 167.  On October 4, 2013, G. Ikawa, M.D., opined that Plaintiff had no mental health diagnosis and no limitations.  AR 167.  Plaintiff had the residual functional capacity to lift twenty pounds occasionally and ten pounds frequently; stand and walk for six hours in an eight-hour workday; and, sit six hours in an eight-hour workday.  AR 170-71.  She had no postural, visual, communicative, environmental or manipulative limitations.  AR 171.  On reconsideration, George G. Spellman, M.D., and psychiatrist E.A. Murillo, M.D., agreed with the initial assessment except that Dr. Spellman opined that Plaintiff could never climb ladders, ropes or scaffolds.  AR 188.

#### 2.      Consultative Opinions: Internal Medicine

##### a.      Opinion (September 2013)

Internist Tomas Rios, M.D., conducted a consultative examination of Plaintiff in September 2013.  AR 702-06.  Plaintiff complained of lower back pain shooting into her right lower extremity and numbness in both legs.  AR 702.  She reported that her cervical spine had been fused in 2006, successfully reducing left-sided cervical radiculopathy.  AR 702.  Dr. Rios observed Plaintiff to be in mild distress, walking with a limp favoring the left side but getting on and off the examining table with minimal difficulty.  AR 703.  Plaintiff used a walker prescribed by her physician.  AR 704.  Straight leg raising in both seated and supine position elicited shooting pain at 70 degrees on the right and 60 degrees on the left.  AR 704-05.

Dr. Rios observed spasms of the paralumbar region with tenderness along the lumbosacral region.  AR 705.  There was positive radiculopathy on the left side and resultant limited lumbar flexion.  AR 705.  Muscle bulk and tone were normal with no atrophy.  AR 705.  There was a dermatomal distribution of altered perception to fine touch in the L4-L5 and L5-S1 distribution on the left side but not the right.  AR 705.  The doctor diagnosed lumbar radiculopathy with

---

[25] The agency analysis notes its failure to secure Plaintiff's medical records from several treating physicians.  *See* AR 163, 166, 167.

14

evidence of nerve root compromise, particularly on the left side, which diminished Plaintiff's motor strength.  AR 705.  She had recovered well from both cervical fusion surgery and left shoulder surgery.  AR 705.

Dr. Rios opined that Plaintiff could stand or walk up to four hours in an eight-hour workday, with five minutes rest every fifteen minutes, and could sit for six hours in an eight-hour workday with five minutes repositioning every twenty minutes.  AR 705.  She required a walker for all distances on all terrain.  AR 706.  Plaintiff could lift ten pounds both occasionally and frequently.  AR 706.  She could occasionally climb, balance, stoop, knee, crouch or crawl and frequently reach, handle, finger and feel.  AR 706.  Plaintiff had no environmental limitations.  AR 706.

### b.      Updated Opinion (July 2014)

Dr. Rios examined Plaintiff and reviewed recent medical records before issuing an updated opinion in July 2014.  AR 809-13.  The doctor wrote:

> This claimant describes collapsing weakness of her legs and knee joints, but no joint laxity noted on today's examination.  She has chronic back pain, but on today's examination no spasms observed and no findings of nerve root compromise.  There is tenderness, however, in the lumbar region.  She had old cervical fusion surgery, but no residual pain or radiculopathy noted.  She has an old surgical scar on the left shoulder region, but no impingement sign observed.

AR 813.

Accordingly, Dr. Rios opined that Plaintiff could stand and walk for no more than six hours in an eight-hour workday; sit no more than six hours in an eight-hour workday; lift and carry twenty pounds [occasionally] and ten pounds frequently; occasionally climb, kneel, balance stoop and crouch; and, frequently reach, handle, finger and feel.  AR 813.  Plaintiff required a cane only for long distances or uneven terrain.  AR 813.

### 3.      Consultative Opinion: Psychiatry (September 2013)

On September 22, 2013, psychologist Pauline Bonilla, Psy.D., prepared a comprehensive psychiatric evaluation.  AR 723-28.  Plaintiff complained of anxiety symptoms accompanied by shortness of breath, chest tightening and muscle tension.  AR 724.  Plaintiff was participating in family therapy associated with her daughter's treatment and took psychotropic medication

prescribed by her primary physician. AR 724. She was able to care for herself independently but

was unable to do household chores. AR 725. Her social functioning was fair. AR 725.

Results of Dr. Bonilla's examination were generally unremarkable. AR 725-26. Dr.

Bonilla wrote:

> The claimant appeared to respond to question[s] in an honest and open manner. There did not appear to be any evidence of the claimant exaggerating symptoms nor did there appear to be any inconsistencies throughout the evaluation. The claimant's symptom severity appears to be in the moderate range. The likelihood [of] the claimant's mental condition improving within the next 12 months with psychotherapy is good. The claimant does not appear to be suffering from a major mental disorder at this time. The claimant's limitations appear to be primarily due to a combination of medical and mental health issues.

> AR 727.

Dr. Bonilla diagnosed:

| | | |
|---|---|---|
| Axis I: | 296.9 | Mood disorder NOS |
| | 300.00 | Anxiety disorder NOS |
| | 307.89 | Pain disorder with psychological factors and medical condition. |
| Axis II: | V71.09 | No diagnosis. |
| Axis III: | | Neuropathy in legs. |
| Axis IV: | | Occupational issues |
| | | Economic issues |
| Axis V: | | GAF: 63 |

AR 727.

In Dr. Bonilla's opinion, Plaintiff was mildly impaired in her ability to interact with co-

workers and the public and to accept instruction from supervisors. AR 727. Plaintiff was mildly

to moderately impaired in her ability to perform simple and repetitive tasks; sustain an ordinary

routine without special supervision; and, maintain regular attendance in the workplace. AR 727.

She was moderately impaired in her ability to perform detailed and complex tasks; complete a

normal workday and workweek without interruptions from her psychiatric condition; and, deal

///

with stress and changed encountered in the workplace.  AR 727.  There was moderate likelihood that Plaintiff would emotionally deteriorate in a work environment.  AR 728.

### 3.    Consultative Opinion: Psychiatry (August 2014)

After reviewing Dr. Bonilla's 2013 consultative opinion, psychologist Mary Lewis, Psy.D., conducted a psychological examination of Plaintiff which revealed nothing remarkable. AR 817-20.  Dr. Lewis diagnosed no psychological impairment, recognized Plaintiff's stress from unemployment, and opined that Plaintiff had a GAF of 85.[26]  AR 820.  The doctor opined that Plaintiff's limitations primarily related to her medical concerns and not her mental health.  AR 820.  Dr. Lewis concluded that Plaintiff's psychiatric condition did not significantly impair any functional occupational area, and that there was minimal likelihood of Plaintiff's deteriorating in a work environment.  AR 820-21.

### 1.    Treating Physician Statement – Dr. Alzagatiti

On December 26, 2016, Dr. Alzagatiti issued a letter "to whom it may concern," which read as follows:

> I am writing this letter on the behalf of my patient, Tracy Perez who is under my care for severe low back pain, low back muscle spasm, significant restless leg syndrome, muscle spasticity in her lower extremities, leg pain, white matter disease, paresthesia in her feet and lower extremities, abnormal reflexes and residual cervical spinal stenosis with history of cervical spine surgery.  She is receiving several medications including Cymbalta, ibuprofen, hydrocodone/acetaminophen, clonazepam, neupro patch, tramadol, carisoprodol, gabapentin, folic acid, supplemental vitamin d, vitamin B12 and vitamin B6.  This patient is unable to work full-time due to her complicated neurological conditions and also the side effect[s] of the medication[s] which include sedation, drowsiness, dizziness and imbalance, I support neurologically this patient for long-term and social security disability.
>
> AR 1243.[27]

---

[26] A GAF of 81-90 corresponds to absent or minimal symptoms (e.g., mild anxiety before an exam), good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns (e.g., an occasional argument with family members).  *Diagnostic and Statistical Manual of Mental Disorders* at 32-35.

[27] Cymbalta (Duloxetine) is used to treat depression and general anxiety disorder.

On December 29, 2016, Dr. Alzagatiti responded to questions posed by Plaintiff's counsel. AR 1244-45. Dr. Alzagatiti opined that Plaintiff could sit for ½ to one hour steadily and stand or walk less than fifteen minutes due to low back pain, restless leg syndrome, and muscle spasms in lower extremities. AR 1244. She could lift less than fifteen pounds. AR 1244. In Dr. Alzagatiti's opinion, Plaintiff would likely miss work four or five days weekly. AR 1`244.

**B.        Determining Residual Functional Capacity**

"Residual functional capacity is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p. The residual functional capacity assessment considers only functional limitations and restrictions which result from an individual's medically determinable impairment or combination of impairments. SSR 96-8p.

A determination of residual functional capacity is not a medical opinion, but a legal decision that is expressly reserved for the Commissioner. See 20 C.F.R. §§ 404.1527(d)(2) (RFC is not a medical opinion), 404.1546(c) (identifying the ALJ as responsible for determining RFC). "[I]t is the responsibility of the ALJ, not the claimant's physician, to determine residual functional capacity." *Vertigan v. Halter*, 260 F.3d 1044, 1049 (9th Cir. 2001). In doing so the ALJ must determine credibility, resolve conflicts in medical testimony and resolve evidentiary ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039-40 (9th Cir. 1995).

"In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record such as medical records, lay evidence and the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment." *Robbins*, 466 F.3d at 883. *See also* 20 C.F.R. § 404.1545(a)(3) (residual functional capacity determined based on all relevant medical and other evidence). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting evidence, stating his interpretation thereof, and

///

---

www.medlineplus.gov/druginfo/meds/a604030.html (accessed November 19, 2019).
Ibuprofen is a non-steroidal anti-inflammatory drug prescribed to treat pain, swelling tenderness and stiffness caused by arthritis. www.medlineplus.gov/druginfo/meds/a682159.html (accessed November 19, 2019).
Tramadol is an opiate drug used to relieve moderate to moderately severe pain.
www.medlineplus.gov/druginfo/meds/a695011.html (accessed November 19, 2019).

making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (quoting *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)).

The opinions of treating physicians, examining physicians, and non-examining physicians are entitled to varying weight in residual functional capacity determinations. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual. *Id.*; *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996). The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a non-examining physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990). An ALJ may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons. *Lester*, 81 F.3d at 831. In contrast, a contradicted opinion of a treating professional may be rejected for "specific and legitimate" reasons. *Id.* at 830. However, the opinions of a treating or examining physician are "not necessarily conclusive as to either the physical condition or the ultimate issue of disability." *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999).

**C.     The ALJ Properly Analyzed Evidence in the Record as a Whole**

"[A]n ALJ is responsible for determining credibility and resolving conflicts in medical testimony." *Magallanes*, 881 F.2d at 750. An ALJ may choose to give more weight to opinions that are more consistent with the evidence in the record. 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4) ("the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion").

The ALJ began her analysis of Plaintiff's residual functional capacity with a lengthy discussion of Plaintiff's credibility concerning her physical and mental impairments and limitations. AR 71-73. She addressed in detail the extensive and complex medical evidence, noting numerous examples of normal or mild results of testing and imagery as well as evidence of medical treatment resolving or alleviating many of Plaintiff's symptoms. AR 72-73. The ALJ concluded that the objective medical evidence did not fully support Plaintiff's allegation that she was unable to perform in a competitive work environment. AR 72-73, 75. Plaintiff does not challenge the ALJ's determination that her testimony was not fully credible.

In rejecting Plaintiff's alleged limitations, the ALJ concluded:

> Overall, the objective medical evidence regarding the claimant's physical condition did not support a finding that she was unable to perform any sustained work activity. In order to establish disability for the purposes of obtaining supplemental security income and disability insurance benefits, the claimant had the burden of proving an inability to perform any sustained work activity. Ultimately the medical evidence simply did not support such a finding. In fact, the objective medical evidence was wholly consistent with an ability to sustain sedentary work activity with the above-cited limitations.

AR 75.

In analyzing Plaintiff's physical impairments and limitations, the ALJ gave substantial weight to Dr. Rios's first consultative opinion, and some weight to Dr. Rios's second opinion, both of which she discussed at length. AR 73-75, 77, 78. She found the first opinion to be consistent with Dr. Rios's examination results and the record as a whole, but faulted Dr. Rios's second residual functional capacity opinion for insufficiently limiting Plaintiff's remaining walking capacity in view of the combined lower extremity disorders documented in the record. AR 78.

Because the record as a whole supported a conclusion that Plaintiff could perform a range of sedentary work, the ALJ gave no more than "some weight" to Dr. Alzagatiti's opinion of Plaintiff's very limited capacity to lift, stand, sit or walk and his conclusion that Plaintiff was unable to work neither full- or part-time. AR 78.

The ALJ gave some weight to Dr. Spellman's opinion and less weight to Dr. Ocrant's opinion. AR 78-79. The ALJ limited the weight given to the agency physicians' opinions based on evidence indicating that Plaintiff had greater walking limitations than the agency physicians recognized and radiculopathy from cervical spine disorders that limited manipulation. AR 78-79.

Objective records of Plaintiff's mental health treatment indicated limited treatment for anxiety disorder and mood disorder. AR 75. Despite stress presented by her daughter's mental illness, Plaintiff was "cooperative with appropriate mood and affect," "had normal judgments and was non-suicidal" and received limited treatment. AR 75. The ALJ's findings echoed those of consultative psychologist Dr. Bonilla, who found that Plaintiff was taking medications prescribed by her primary care physician; performed unremarkably in the psychological assessments; could

follow three-step directions; demonstrated normal concentration, judgment and insight; but, struggled with arithmetic calculations and abstract thinking. AR 75-76. Dr. Bonilla opined that Plaintiff's mental impairments were likely to improve with psychotherapy within the next twelve months. AR 76. The ALJ gave significant weight to Dr. Bonilla's opinions for being "consistent with the medical record, examination findings, and the overall evidence of record." AR 78.

Following a later consultative examination, Dr. Lewis found Plaintiff's mental functioning generally to be within normal limits. AR 76-77. Plaintiff's arithmetic calculations, memory and abstract thinking (as measured by interpretation of a proverb) no longer were impaired. AR 76. In fact, Dr. Lewis did not diagnose any mental health impairment on Axes I or II. AR 76. "From a mental health perspective," wrote the ALJ, "the claimant appeared to function normally." AR 77. The ALJ gave some weight to Dr. Lewis's opinion but limited Plaintiff to non-complex routine tasks in view of Plaintiff's depression, chronic pain and side effects of medication. AR 78.

The ALJ gave some weight to the opinions of Drs. Ikawa and Murillo that Plaintiff had no severe mental impairment, but concluded that later evidence indicated that Plaintiff was more limited that was apparent when the agency physicians issued their opinions. AR 79.

"[A]n ALJ is responsible for determining credibility and resolving conflicts in medical testimony." *Magallanes*, 881 F.2d at 750. She properly determines the weight to be given each medical opinion by considering the evidence in the record as the ALJ did here. 20 C.F.R. § 404.1527(c)(4) ("the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion"). The record must include objective evidence to support the medical opinion of the claimant's residual functional capacity. *Meanel v. Apfel*, 172 F.3d 1111, 1113-14 (9th Cir. 1999). Inconsistencies with the overall record or with a physician's own notes are a valid basis to reject a medical opinion. *Molina v. Astrue*, 674 F.3d 1104, 1111-1112 (9th Cir. 2012) (recognizing that a conflict with treatment notes is a germane reason to reject a treating physician's assistant's opinion); *Connett v. Barnhart,* 340 F.3d 871, 875 (9th Cir. 2003) (rejecting physician's opinion when treatment notes provide no basis for the opined functional restrictions); *Tommasetti*, 533 F.3d at 1041 (incongruity between questionnaire responses and the Plaintiff's

medical records is a specific and legitimate reason for rejecting an opinion); *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 692-693 (9th Cir. 2009) (holding that a conflict with treatment notes is a specific and legitimate reason to reject a treating physician's opinion).

The Court is not required to accept Plaintiff's characterization of her treatment records. The ALJ fully supported her evaluation of the medical opinions and the limited weight she accorded Dr. Alzagatiti's opinion with evidence of record. Further, the ALJ was not bound by Dr. Alzagatiti expressed opinion on the ultimate issue of Plaintiff's disability. *Morgan*, 169 F.3d at 600.

Even if this Court were to accept that the record could support Plaintiff's opinion, the record also amply supports the ALJ's interpretation. When the evidence could arguably support two interpretations, the Court may not substitute its judgment for that of the Commissioner. *Jamerson*, 112 F.3d at 1066.

**VIII.   Conclusion and Order**

Based on the foregoing, the Court finds that that substantial evidence in the record as a whole and proper legal standards supported the Commissioner's decision denying in part and granting in part Plaintiff's application for disability insurance benefits pursuant to Title II and supplemental security income pursuant to Title XVI of the Social Security Act. Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security. The Clerk of Court is directed to enter judgment in favor of Defendant Andrew Saul, Commissioner of Social Security, and against Plaintiff Tracie Danette Perez.

IT IS SO ORDERED.

Dated:   **November 21, 2019**          **/s/ Gary S. Austin**
                                        UNITED STATES MAGISTRATE JUDGE